Good morning and may it please the Court, this is a capital case from South Carolina. I represent the Warden and Commissioner in this appeal from the Grant of Relief in the District Court. We are, of course, asking this Court to reverse that Grant of Relief. You need to get a little bit closer to the mic. It's hard to hear you. Is this better? Yes, it's better. Thank you. And you're speaking across the room, so just keep your voice up. For 15 years, the State of South Carolina has pursued its duty to seek justice in this murder case, while its courts have protected the balance between that duty to seek justice and Mr. Williams' rights, including his constitutional rights, but that balance was lost in the District Court. Our legal position can be summarized very simply, and that is, if Harrington v. Richter stands, then this District Court order cannot. The District Court failed to apply the proper deference that 2254 review requires. And a reading of the order supports that completely. When read plainly, the order from the District Court shows that the District Court did not have confidence in the opinion from the post-conviction relief judge. It believed trial counsel, actually two of the four who testified, believed those two without looking at the context which that testimony was given. What do you mean by that? What's the context? The context is when you go into post-conviction relief, you have not only the testimony that comes from the stand, but what happened in the trial. And there is a reflection in that trial of the actual strategy that was chosen, that was executed throughout the trial proceeding. No one disputes that they chose the strategy. The question is whether or not they ignored or failed to consider what appears to be on the face of the record, an equally, if not more, meritorious strategy. I mean, we may quibble about that, but the question is, did they fail to consider something that appeared to be obvious on the record? And again, that goes back to context, not just the trial as that basis, but what trial counsel said and what Jan Vogel saying, their mitigation investigator said. Well, the problem for you is that the lawyers have essentially conceded that they dismissed it. They didn't think at all about fetal alcohol syndrome, or if they did, they didn't remember, they didn't pursue what appeared to be obvious. And I recognize that a lot of this may be Monday morning quarterback, we're not supposed to do that, but it doesn't strike me that this is all that difficult to look at and say, you know, in this case, however deferential you want to be, they conceded that they didn't consider fetal alcohol syndrome. And the judge, the trial judge, the habeas judge, essentially said that, even, and despite that, came to a conclusion that it didn't matter in the context of this case. And I just have trouble reconciling that position. Certainly, well, there are a couple of concepts at issue. First of all, when you look at a Strickland claim, you have whether the attorneys are fulfilling their investigative duties. And I don't think that anyone would disagree. They assembled the correct team and they had an investigation. Ms. Vogelsang was not an expert who would testify on fetal alcohol syndrome, but she certainly had experience in identifying the information to take to experts or to counsel. In fact, she testified during the post-conviction relief hearing that she was aware of that from the late 70s forward and had actively sought whether that was something, an angle that they should look at in this particular case. Keep in mind, too, the contemporaneous... Did she relay that to the lawyers? Yes. And the lawyers... Where is that in the record? That is in her testimony. It is, if I... I mean, as I understood the record, she may have come to that conclusion, but I don't think she delivered that view to the lawyers. And I don't know that you can argue ineffective assistance of the mitigation specialist. The question is, what did the lawyers do? And again, we have those mixed concepts, and you're absolutely right. I don't think anyone disagreed that she was looking for that, and if you might recall from the joint appendix, I believe there's an exhibit there, and certainly in the post-conviction relief testimony, we went over an exhibit where she had themes, and mother drinking during pregnancy was there. She testified that she was considering the fetal alcohol syndrome issue, and I thought rather critically in her testimony in the post-conviction relief proceeding. She explained she was not surprised that the trial counsel did not want to go down that aisle because there was learning disability, there were other indications that... Why do you say he didn't want to go down that road as opposed to going down other roads without making that decision? Absolutely understand that. It's the concept that we're talking about, this mesh of concepts. First of all, I think we need to go back a step and remember that the murder occurred in 2003, trial in 2005. So 2003-2005 is the investigative term. At that time, and John Maldon, one of the trial attorneys who did testify in the post-conviction relief hearing, said that they were not all that focused on fetal alcohol syndrome as a defense in the community at that time. He said, in fact, that later on, he was more in tune to that fetal alcohol syndrome. Mr. Maldon testified that in 2004 and 2005, were you aware of a relationship between the size of the head and fetal alcohol syndrome? I certainly was aware of that correlation. Is there some review concerning fetal alcohol syndrome? I wish I could say that I connected that, but I did not. So I guess the question that sits in my mind is the post-conviction relief court said that the attorneys made a strategic decision to not present the jury evidence of brain damage, etc. But it doesn't appear to me that they were even aware of the strategic decision. What evidence is there in the record that they were aware of the facts sufficient in order to make a strategic decision? Well, there are two things that are actually in that particular question post, Your Honor. One, as you said, brain damage, evidence of brain damage. And one, a specific condition of fetal alcohol syndrome. The brain damage evidence was absolutely something that the trial attorneys did consider. The brain damage was detected by Dr. Evans. And Mr. Malden testified that they were not going to put Dr. Evans up. They did not want to put Dr. Evans up, and in fact, they did not. That was the evidence of brain damage. Because what you have is you have dysfunction. You have a limitation. What you hear is fetal alcohol syndrome. And the state post-conviction court said that they made a strategic decision. Right. And what I'm looking for is the evidence in the record that they made a reasonable investigation about fetal alcohol syndrome and that they made a strategic decision not to present it. Because it looks like that they just overlooked it completely and never considered it, which would make a strategic decision very difficult to make. Well, going back to the post-conviction relief court's order, Your Honor, what the judge did was review everything that the defense team had. And that includes Ms. Vogelsang's investigation, her sensitivity to fetal alcohol syndrome, and then the evidence that they actually have from Dr. Evans of brain damage from recognized testing instruments. Then you have Dr. Halleck's opinion that was a psychiatric opinion. You have Dr. Richards. So what I'm suggesting to this court, to look at it from the investigation standpoint, when you make up... And that went into their mitigation argument, which was credible, about this is a bad childhood and all that sort of thing. Right. Fetal alcohol syndrome is separate from that. And I don't know that it, for any reason, is mutually exclusive of the defenses that they pursued. The question I keep trying to get at is, what was their decision-making process to exclude fetal alcohol syndrome? And I'm not seeing that in the record. Well, going back to what they had, it's not that counsel has to identify specific conditions, specific potential causes of brain damage. That's not what counsel does. Counsel looks at what is there from their experts and decides on a theory. Now, what the PCR judge determined is that they made a strategic decision to go with the psychiatric diagnosis. And where is it in the record that they ruled out fetal alcohol syndrome as an option? Where is that? Well, legally, I don't believe you have to for a specific strategy, because if you choose one strategy, it's to the exclusion of other strategies. You don't know what that strategy is. But, for example, Your Honor, in the first MR from 2004, if you look at the report and it's in the joint appendix, the suspected condition at that point was autism. Well, we're not saying that they had to get an expert in, determine whether autism, spectrum disorder, or anything else was there. They had to look at the organic brain damage evidence. To put the burden on trial counsel to disprove, essentially, a litany of potential medical issues is totally blurring what an attorney should do. How would an attorney know? The job with the Supreme Court's line of wiggins says there has to be a reasonable investigation, and that the court may disagree with the choices that counsel makes, but they have to, there has to be some record evidence that they conducted a reasonable investigation, and based on that, they made a choice. Even if a court later may say, well, if we would have tried the case, we would have done it differently, but at least they made a bona fide effort to try to figure out which is the best way to go, and that's what I'm having difficulty finding they did here with regard to the fetal alcohol syndrome. Well, I think it's whether you view it broadly or you view it narrowly. Strickland requires a strategic decision based on sound investigation and on reliance of experts when you need that. That's what Strickland requires. Strickland does not require that you go through the DSM-IV or the DSM-V now and decide which ones don't apply to me, make sure I've ruled those out before I make my strategy. There's nothing in there that would suggest that, and I would suggest to this court that would be totally impractical. But you do have to know who to go to for investigation, and you do have to have a sound strategy. I don't believe anyone on the panel, and I don't believe anyone in the litigation has ever said it wasn't a sound strategy. It certainly was a strategy supported by expert testimony, qualified experts, and importantly, it went with the facts of the case. It was not in contest with the facts of the case. This is especially important when you see the reliance on Dr. Halleck's testimony, that this was an episode. Now, when you talk about any type of damage, organic damage, that is not an episode. That is a danger because you're damaged and you do not function correctly. So that's the damage in putting everything together. I believe, Your Honor, that you had mentioned earlier that these are not necessarily inconsistent. I agree they're not necessarily inconsistent in a medical evaluation, but for obtaining the trust of the jury in presenting that evidence, you want consistency. And I would suggest to you when you look at the record, and again, as we said before, we're talking context, the entire record, the trial, to PCR, to all investigations. What is the strategic choice? And that's my question again. How can you make a strategic choice if you don't know what the choice is? Well, I think that goes back to, do you have to disprove everything in the DSM before you make that decision? No, but you do have to sort of, I think you do have to make a reasonable investigation when there's evidence supporting a particular theory that might be viable. I mean, I agree with you, you don't have to go down every rabbit hole, but this wasn't a rabbit hole. There was evidence supporting the existence of a fetal alcohol syndrome issue, and the lawyers, if you accept the record, simply didn't pursue it. Well, two things if I may. One is that they did make a sound strategy based on investigation. So we have that as our baseline. The fetal alcohol syndrome is not in some way proven. What the claim was in post-conviction relief is that counsel was ineffective. So what was shown is that there was an opinion available. There is still a problem with that opinion, which was brought out, I think, very ably on cross-examination about contemporaneous standards, whether it would have been available to have this type of team approach to diagnosing. And, of course, you have the MRI that does show everything within the normal limits, which tends to cut, again, that limit. But didn't the ABA standards identify fetal alcohol syndrome back then as something that lawyers should consider in a capital case? Which Mr. Nettles actually agreed with and remembered that and said, yes, they did, but they have got one. But this is something that, I mean, experts could diagnose even back then. And I recognize that eight, nine, ten years later, the science may be much more sophisticated. But the question is whether, as you put it, during that window of time, these lawyers could reasonably have investigated that theory of defense as a mitigation defense and come to some conclusion about its viability. And I get back to Judge Agee's question, how can you do that when you are simply not aware of it? And, as you said, some conclusion about the viability. And Dr. Adler testified during the post-conviction relief hearing that it was available, but often it was misdiagnosed or the diagnosis wasn't sufficient. And this would be before 2005. But, you know, don't you have to make the effort? And I think that I am out of time, but I would like to make one suggestion, if I may, for the panel. You can answer the question. Thank you very much. One suggestion, we are talking about going down the checklist, the DSM-5. I do want to call the Court's attention to the actual habeas petition that was before the District Court. Now, while we are focused on fetal alcohol syndrome as some of the questions we've heard today focus just on that condition, in Ground 12 of the habeas petition, Mr. Williams is actually moving away from fetal alcohol syndrome. In Ground 12, he has suggested, he alleged, and this is one of the grounds that are stayed, but it is an example of where we are today. And he alleges that in his case, talking about dysfunction and issues that he has, in his case, an outgrowth of genetics would be the explanation, more than of any acquired congenital circumstance, in parentheses, FASD. He's actually moving away from FASD at this point in his own litigation. And that shows you the type of development that we often see in capital work. And I would suggest, again, if counsel is reasonable, under Strickland, it's going to be very, very difficult, very difficult to say his strategic decision should not be upheld. I thank you for your indulgence, Your Honor. Thank you, Ms. Brown. Ms. Barber? Good morning, Your Honors. My name is Seth Barber, on behalf of Mr. Williams. I think the fundamental problem with the analysis that the state is making is it's relying on the wrong Supreme Court case. I mean, this is not the review here,  It's relying on the wrong Supreme Court case. The Supreme Court's review of what the district court did is not governed by Harrington v. Richter, but by Wilson v. Sellers, which was a case decided by the Supreme Court in April 2018. And the reason for that is that this is a case where there is a full reasoned opinion by the state PCR court, unlike in Harrington v. Richter. And the Supreme Court, in Wilson v. Sellers, held that in instances where the state post-conviction court has set forth its reasoning, the issue is not whether or not there is some hypothetical explanation that could justify the conclusion that the state has come up with, but whether the actual explanations that the state court has given were an unreasonable application of clearly established laws as set forth by the Supreme Court or an unreasonable determination of the facts. And that is what occurred here in this case. The arguments that the state has made, both in its brief and in oral argument today, are really along the lines of what reasoning the state court judge might have made in looking at the entire record, but what the state court actually did here, I think, is quite clear. The state court, on the question of whether there was deficient performance, the state court said that trial counsel made a strategic decision, and I believe it was in parentheses, although trial counsel was unable to articulate the reason for that decision, there's simply no support whatsoever in the record for that finding and for that reason, it's an unreasonable determination of the facts. A situation where... Is there a way to read that opinion as simply discounting the sort of Monday morning quarterback by the defense lawyers? This wouldn't be the first time, I suppose, that a defense lawyer, particularly in a capital case, would fall on his or her sword for their clients by suggesting that we dismiss whatever it was, whatever the theory was. Is there a way of reading it that way? Respectfully, Your Honor, I don't think there is a way of reading this holding in that way. It is certainly... That is reasoning that a state court judge could have adopted, but it's not the reasoning here, and let me point to two things regarding that. Mr. Nettles, who, parenthetically at the time, was the United States Attorney for the District of South Carolina, he had been in private practice when he tried the case, but at the time he was testifying, he was the sitting U.S. Attorney, admitted that he made two strategic decisions that were relevant to other ineffective assistance claims. So he acknowledged that he made a strategic decision not to object to the solicitor's arguments about the prison conditions being like a small city with restaurants, etc. He also acknowledged that he made a strategic decision not to call Mr. Williams' mother, Daisy Huckabee, as a witness. She is one of the sources of evidence that, obviously, that she drank during pregnancy, but there was evidence that was admitted of drinking during pregnancy from the father. But he acknowledged the strategic decision not to call her in relation to another issue. In this instance, Mr. Nettles simply said it didn't come to the issue of whether or not to pursue a fetal alcohol syndrome defense. It didn't come up, it was never considered, never discussed. And the testimony of the other trial counsel was even more definitive. That was Mr. Mauldin, who was, at the time, the public defender for the circuit. And his testimony was, what could possibly have led me to not conduct some sort of follow-up is just beyond me. I don't have an explanation for it. And this is in the joint appendix at 528. I surely didn't do it intentionally. I will assure you I did not do that intentionally. That would have been horrible. So he was unequivocal. The language that the PCR court uses in characterizing this is that they were unable to articulate a reason. A situation when someone can't articulate a reason is when they say something like, I decided to do this, I can't remember today why we decided to do it. Let me ask, so if I recall Ms. Brown's argument, the record, I think, is clear that at least the mitigation specialist was dancing around this issue of fetal alcohol syndrome. And she seemed to suggest, Ms. Brown did, that in fact she presented her conclusions even tentative to the defense team and it just moved on. Is that accurate? Well, I think a fair reading of her testimony. She certainly advised trial counsel of two key facts. That the mother drank during pregnancy and that there was evidence of brain damage. There is no testimony whatsoever that she spoke to them and told them this means that there is fetal alcohol syndrome. There is no testimony anywhere in the record that there was discussion of whether or not to pursue a fetal alcohol spectrum defense as a course of fetal alcohol syndrome deficiency argument as part of a mitigation case. And that's why, in their brief, the state argued that there is an inconsistency between Ms. Vogelsang's testimony and the testimony of trial counsel and attacked Judge Childs for making what the state characterized as credibility determinations. There's no conflict whatsoever in that testimony. There's not a shred of evidence, whether it's testimony from Ms. Vogelsang or any other witness anywhere in the record, that there was, in fact, consideration of that as an alternative. Is it also clear that even back when this case was being tried, that this was something that lawyers could and indeed would investigate and could determine, make a diagnosis, even if the science might not have been as sophisticated as it is today? Yes, and again, there's undisputed testimony on that point from, for example, there was reference before to Mr. Nettle's testimony, but Mr. Malden, again, was even more definitive on this point. He said that he was aware of this, and when he was asked, I believe it was on, I don't recall whether it was cross-examination or redirect examination, what he would have done in that instance, his answer is, I would have gone and consulted with a neurologist. And there is also, in the PCR record, the affidavit of the neurologist, Dr. Greismer, who had been consulted, but Dr. Greismer had not been informed of the evidence that A, the mother had been, had drank during pregnancy, or B, of the neuropsychological testing that had been done that revealed evidence of frontal lobe damage. And that is all set forth in Dr. Greismer's affidavit, which was part of the PCR record, and is in the joint appendix at page 97. So the building blocks of a fetal alcohol syndrome defense were in front of trial counsel. Building blocks is really another way of saying red flags, and they did not act on them. And that's where they fell short. And the duty of trial counsel, and this has been established by a line of Supreme Court cases, Sears v. Upton, Wiggins, that just because counsel pursues some mitigation strategy doesn't mean that they are obviated for a need of fulfilling their duty to consider what all reasonably productive mitigation avenues might be. And the state, in their argument, said essentially that if trial counsel chooses to pursue a strategy, in this case to present the mitigation case that they did, it necessarily means that they've chosen not to pursue any other strategy, and therefore that can be considered a strategic decision and is essentially non-reviewable in Strickland. And that's simply not the law. That's not Wiggins. That's not Sears v. Upton. There are plenty of cases where counsel has pursued mitigation strategies, and the Supreme Court and this Court have held that counsel's performance was constitutionally deficient because either the decision to pursue that strategy was not based on a reasoned strategic decision of considering alternatives, or it was not an informed strategic decision. And that is essentially the message. So what would happen to your case if the record showed, for instance, that the attorneys did not conduct an investigation on fetal alcohol syndrome, but they talked about it, and they decided that it was too much of a double-edged sword and would show future dangerousness, and they were afraid to introduce that into evidence and have it go before the jury? If they had made that considered decision, we would have a very different case, Your Honor. But that's not this case. And, you know... Well, let me just follow up on that. Doesn't that in some ways go to the question of prejudice, which Ms. Brown didn't have much of an opportunity to talk about? But if it's true that the evidence might have been a two-edged sword, that they perhaps would have been able to impeach the diagnosis through the MRI and other evidence tending to show that there was a normal brain scan, and or impeach the evidence of actual drinking by the mother, doesn't that make it for a difficult case on the question of prejudice? Well, there's some factual assumptions built into that, Your Honor, that I think are not ones that are in the record. I mean, those could be arguments. But, you know, the issue... I think you have to start with the standard of review here. And because, as we pointed out in our brief, the PCR court did not conduct a prejudice analysis in the manner prescribed by the Supreme Court in Port of McAllen, that means that the district court had to do a de novo prejudice review, and, in essence, evaluate the mitigating evidence that would have come in compared to the other mitigating evidence and the aggravating evidence that's in the record. Here, on the double-edged sword point, you had testimony, and I believe it was from Dr. Adler, that the fact that there is... It may have been Novick, Brown, or Adler. I'm not positive which one. But the fact that there's fetal alcohol syndrome doesn't imply that in the structured environment of a prison, a person suffering from fetal alcohol syndrome is going to be at risk of future dangerousness. The whole point of the diagnosis, and this is why it would have been particularly powerful in this case, is that it renders the person who has grown up with that brain damage at essentially a childlike level, and particularly vulnerable in moments of stress and strong emotion. That was in the testimony of Dr. Novick, Brown. So that was the situation confronting Mr. Williams, a breakup with a girlfriend in the unstructured world of everyday life. Prison, which was the alternative that the jury was considering, is a very structured environment. So the generic double-edged sword concern is not particularly applicable here. Nor was this a case where the state was arguing future dangerousness. The argument that the state made, that the solicitor made, was for one, there are mean and evil people who do not deserve to continue to live with us. That's at page 639 of the joint appendix. Presenting evidence that Mr. Williams was born with this condition because of his mother's drinking would have given the jury a powerful answer to that. But there wasn't any answer presented at trial. What is the consequential difference had they relied on that diagnosis? Halleck knew pretty much of the full condition. He didn't talk about brain damage so much, but he did talk about the consequences and how it affected the defendant. And my question is, is the fact that had they used the word fetal alcohol syndrome and recognized the symptoms of that, what would they have said to the jury in addition to what they'd already said to the jury based on their observations that he was a very sick man, he was immature, he was emotional, the most serious depressive diagnosis we have in the manual is obsessive-compulsive. They talked about all these things to the jury, and the question is what more would they have said had they made a diagnosis actually of that particular syndrome? So I think it's not a question of semantics. It's a different condition with different consequences that come from it that are meaningful in ways that would have been quite helpful in dealing with the jury. As I said earlier, the consequence of fetal alcohol syndrome, in this case partial fetal alcohol syndrome, is that in particular it means that notwithstanding outward appearances, notwithstanding a high IQ which masks the condition, the person in effect is childlike. And our judicial system has long recognized that there's a difference in culpability for people who are children or operating at the level of children. Is that a different way of saying that he was immature? I thought Judge Nemar mentioned that that was evidence presented in the record. Well, I think there's a difference between sort of characterizing someone's behavior and giving a clinical explanation for it. I think to the extent that there was evidence in the record that he was immature, it was looking at the behavior as opposed to the explanation for it. And, you know, we're talking about... One of the particular conclusions that was fairly, I thought would have been fairly helpful to the defendant, they said that the illnesses fed on each other are contributing to a powerful sense of hopelessness and helplessness, even to the extent he had his own suicide attempt in 2003. And my point is I haven't matched up all the consequences, but I'm wondering when you're trying to figure out how best to convey to the jury that this man had less culpability, they said some very powerful things, and they had all that data on it. Didn't Halleck know about brain damage and chose not to testify about it? I don't recall that piece of the record, Your Honor, but I... They had the normal MRI and they had the evidence that one of the symptoms of syndrome, the FAS, is that a person is unable to plan and think ahead. And, of course, they had the diaries and they had the draft letters in there and it looked like he had thought about this and planned it out. The real question, and it may go to the prejudice prong, which we haven't heard much, but it also may have gone to the fact that when you have an expert like Halleck and these others that knew of brain damage but had to face the MRI and had to face some of these other consequences, lawyers didn't recall why they went down a particular route, but the evidence was in the team and had been discussed among the team members and they presented a very powerful mitigation case. They had four experts and they had two of the best lawyers in capital cases and then they had this Washington law firm participate and say, you have a lawyer team. This was not like a Wiggins situation. These lawyers had looked at all of this and the fact that years later they couldn't figure out why they didn't identify particular FAS hardly is damning. If they knew there was brain damage, they did know that, and they chose not to present that to the jury. They found it more powerful to have these psychological diagnoses which contributed to each other and gave these effects  I'm worried that we focus so much on the particular diagnosis and we're not focusing on whether these lawyers were acting unreasonably in the consequences. It's hard to think that a team of lawyers with that much power are going to be found by us to be so constitutionally ineffective because they didn't come up with the FAS diagnosis even though they had the data to support it. They knew that she drank. They knew that he had brain damage. One of those doctors actually talked about, came to the conclusion it was brain damage. Is that the standard that we should be applying? Go ahead. I see your red light, but this is important. We'll extend a little bit here. Thank you, Judge. There are a few, I think, questions packed in, Judge Niemeyer, with what you just said, and I'll try to address each of them. With respect to the point that the MRI result would have been inconsistent with a diagnosis of fetal alcohol... They didn't pay much attention. It came very late. This is five days before trial. But my point was, if it had come in abnormal, then it might have triggered a whole new exploration. But wasn't there evidence, even before the MRI came back, that the defendant was brain damaged? Yes, there was. And that was not used, deliberately not used. The experts who testified did not refer to that. They referred to the combination of psychoses, the problems, and apparently thought they got a more powerful impact for the jury on that. Well, that, respectfully, Your Honor, is where I would disagree, because when you characterize it as they found it more powerful, that implies that there was a decision made, and what was missing was the connecting of the dots. They had the individual pieces of mother drank, brain damage... They had dots in order to get to an FAS diagnosis, but they didn't need to connect the dots to say, what was the effect on the defendant? What is the best defense? We have lawyers here trying to defend a defendant and communicate to the jury an explanation which would spare the defendant the death penalty. And so they came in with some very powerful testimony, explaining all these various things about how he was highly disturbed, he was very sick, he was hopeless, he was helpless, episodic, highly depressed, very short attention span, and immaturity, very weak academically. These are the things they all presented. And my question is, if they had diagnosed FAS, what more would they have said to the jury? Well, I think I've gone through some of the things that one can say in FAS. Well, in addition to what they already said, that's my point. In other words, they picked, clearly picked, if they had this knowledge, and it's indisputable, they had this knowledge of brain damage, Halleck had it, and there is a question of whether, what's the woman's name, how much she communicated. Vogel Center. Yes, yes. There's a question of how much she communicated, but clearly the others had information, and they actually did an MRI following through on that, and that didn't lead to anything. But the bigger question is not whether they missed the diagnosis. The bigger question is did they miss any evidence that would have helped their client in front of the jury. And my point is, we have a team here with a lot of data. We have four experts, we have I don't know how many lawyers, three or four lawyers, all very highly experienced, and they presented a powerful mitigation case. And all those things I've talked to you about, weak academically and immaturity and short tension span and highly disturbed, sick young man, depressive episode, most serious depressive diagnosis we have seen in the manual, obsessive compulsive disorder, and then they said these all fed each other in him. The jury heard a lot. And the question is what more were they heard if they heard those words fetal alcohol syndrome. And that seems to be the whole argument you're making is they didn't use that language, and that would have been great for the jury. Not that they didn't use that language, but that the jury was deprived of the testimony about what the effects of that disorder would be, including testimony... And I'll let you answer this one question, and the question is what additional symptoms would they describe to the jury about this man that was not already presented based on the other approach they took, which is not to focus on brain damage. So I think it's not simply a question of symptoms, and I won't reiterate what I've been through. It's also a question of degree, and it's a question of level of impairment. Tell me what more they would have said to the jury that they didn't say to the jury had they been counseled that you believe would have been reasonable. Well, Dr. Adler, for example, testified that the impairment... This is at Joint Appendix 573, that the impairment from fetal alcohol syndrome is much greater than that from bipolar disorder, which was what was testified to at trial. Except the bipolar disorder was one of other things diagnosed, and then the testimony was that they contributed and created a greater condition than the individual additions of the two conditions together. Well, I'll just say this. I think that it's a question of the additive value and the standard... But I haven't seen in the record, I haven't seen in any brief, anything, not even iota, what more would have been said to the jury that would have helped the defendant. That's my point. We're focusing on whether these lawyers... There was no protocol for FAS back then. This has all been developed. They knew about it since the 70s, but drinking during that time, they suspected brain damage. They actually diagnosed brain damage. They did an MRI just to confirm it. Had the MRI came abnormal, I assure you that team would have said, let's hold up, we want to put some more data in. They got it only, what, five days before the sentencing. But my whole point is, they covered just about every aspect of this human being with an explanation of how he could have murdered and not had culpability. Well, I think I'll just finish with this, Judge. I know I'm overrun. I think they didn't cover this explanation. And to answer the point you made about, how can we imagine that such a talented and large team, how can that be ineffective assistance? No, I didn't say that. I'm basically saying, here we have a team. It's not like Wiggins. They're lazy and didn't do it and didn't follow. They had four experts. They were figuring out their defense. They talked about this stuff. Now, if they don't remember the reason they didn't pursue one course as opposed to another, they knew of the brain damage. They knew of the drinking. They didn't, apparently, nobody identified FAS. There's no testimony to support the notion that FAS was actually discussed. But they did develop a very sophisticated mitigation case. And the question is, does that go to prejudice or does that go to the effectiveness of counsel? My only point was, there's no evidence to suggest these guys fell into the Wiggins-type category. We're asked the question, did this defendant get objectively reasonable representation at this time? And I think they got a pretty high level based on what I've seen and what they put together and what they were able to tell the jury. Now, the question is, that may not answer everything. Your argument is, they didn't discover FAS as FAS. And my question is, okay, they discovered a lot of the aspects of it, brain damage. They knew about the drinking. They knew about various other aspects. My question is, what would any one of those persons have said to the jury in addition to what they did testify? Except the letters FAS or the name. Again, I agree, it's not the label that's meaningful. What's meaningful is the explanation of the difficulties of behaving in society. When you have a person with a difference between their IQ and their ability to control executive function. When you have someone with PFAS... So they say he's weak academically. They say very weak academically. He had to have remedial services. He was very short attention span. He was immature. He was diagnosed at some point with ADHD and his medication was refused. He dropped out of school at the age of 18, only in the ninth grade. That covers that part, and then they went even further and they talked about how he was sick. He was highly disturbed. He was suffering a major depressive episode. This is a lot of powerful stuff. Well, I mean, some of it I think, Judge, those are symptoms. The fact that he dropped out of school. Those are things that happened and what's missing. My question on that, my observation there, is only to point out that what you said was that he acted like a child and basically wasn't responding emotionally and so forth. He was responding as a child. The jury was told that. But there's a difference between acting like a child, which unfortunately many of us do at times, and if I do that, it's inexcusable. If you have someone who does that and the reason for their doing it is the organic brain damage that they were born with as a result of their mother's drinking, I think that has an appeal to... Didn't Hallican diagnose brain damage? One of the doctors did. Your Honor, I don't recall that part of the record one way or the other. But whether there was that piece in the record or not, I think there's a difference between making that statement generally and connecting it to the consequences. That's my point. The specific type of brain damage. They knew he was brain damaged. That was diagnosed. They knew he was brain damaged. The question is, what's the consequence? What can we tell the jury as a result of that conclusion? And what they can tell the jury is, and then I couldn't find it, more than what was said. I mean, what was said to the jury was a lot. And I'm trying to find out what attribute, what description about the defendant would they have said more had they connected the dots to FAS? Even though they had some of the medical diagnosis of that. And your answer is basically that he was, what, a child? Because of the deficiency that he had, yes, he was operating at a childlike level. And top of that is the condition, because of the nature of PFAS, was masked by him, and therefore in many ways he's more vulnerable. In addition, it's much more powerful evidence of his inability to conform his conduct than was presented at trial. Do you think he was able? I haven't seen testimony as strong in mitigation about the weaknesses this child had. The only positive thing for the government that they had to conclude is he knew right from wrong and was able to commit a crime. Well, I think that's actually quite relevant to the analysis, because if we were assuming for the moment deficient performance, then the standard is whether or not there's a reasonable probability that might have led to a different outcome or sufficient to undermine confidence in the outcome. This was a close case. The jury was split nine to three. They deliberated overnight. As you point out, there wasn't much on the aggravation scale. The only aggravator that the state alleged was that this was done in the course of a kidnapping, and the kidnapping was essentially the murder as well. So when you balance that on the one hand with, yes, there was a lot of other mitigating evidence, if there had been some additional mitigating evidence, I submit that there's a reasonable probability the jury would have come back with a light verdict. All right. Why don't we hear from Ms. Sear? Thank you, Your Honor. Oh, yeah, thank you. Am I supposed to pronounce the P or just the S or both? Both at once, Your Honor. C. C. C. May it please the Court. Alice Sear of Whiting Case for the Federal Republic of Germany as amicus curiae. Your Honor, I want to just jump in and answer your two last questions. The first is what they would have said to the jury had they gotten a diagnosis of fetal alcohol syndrome, and two, where they failed in the investigation with respect to brain damage and MRI. So let me begin with the diagnosis of fetal alcohol syndrome. Your Honor, fetal alcohol syndrome is profoundly different than any of the other mitigators that were presented at trial, and the reason for that is because of the unique characteristics of this brain damage. So the first is that fetal alcohol syndrome arrests an individual's brain at the level of a young child such that they never develop past, on average, the level of a 6-year-old in their adaptive skills, and in Mr. Williams' case, the level of a 9-year-old. And so while mental health conditions give you a less culpable adult, what fetal alcohol syndrome gives you is a child in an adult's body, and children are fundamentally less culpable than adults are. Now the second piece of that is that... in a way that the other mitigation evidence did not. I beg your pardon, Your Honor? That it would, to put it in a very shorthand phrase, that that would give you a cause-and-effect defense that the other mitigation evidence would not. It would put the other evidence in far greater context and explain Mr. Williams' actions in a way that the other evidence could not, because the second part in which fetal alcohol syndrome operates, and in this it is unique from any other condition, is that it combines an average level IQ with adaptive deficits that are equally bad as intellectual disability. And there's no other condition like this where a person functions essentially as an intellectually disabled person, and in Mr. Williams' case, the record is undisputed that he had profound adaptive function deficits, but it excludes them from an intellectual disability diagnosis, or has until the very recent past, because those deficits coexist with the high IQ. And so what you have is somebody that is not identifiable under the kinds of services that are offered to intellectually disabled people, but that has all of the same deficits that go to the heart of culpability of these two groups that we know are different in U.S. jurisprudence. We don't execute intellectually disabled people because of their deficits in reasoning. We don't execute children because of their deficits. And fetal alcohol syndrome goes to the exact same kinds of issues in a person, and the jury never got to hear that information. And even without hearing it, three jurors were leaning towards life, and the jury was badly conflicted. And so getting that information, finding out that the mother's drinking didn't just give him a bad life, but made him a fundamentally less capable individual, that would have packed a powerful punch. And so let me move on to address the evidence that they had and what they did and didn't do. Because what they had initially is some evidence of brain damage. I thought your argument was going to go to the failure to consult the German counsel. No. No, you're not going to talk about citizenship and that sort of thing. No, Your Honor, because that wasn't the ground of Judge Child's decision. I thought that was the argument that you raised. We did raise it below. We have not argued it before this Court. Although when Germany was alerted to the fact that Mr. Williams is a German citizen as well as a U.S. citizen, and the group refused to involve itself, they were able to investigate in Germany and gather a wealth of information that, had that information gone to the experts, would have permitted a defense. But here... You're not claiming that's some sort of error in this case. That's not an argument that we've raised before this Court, Your Honor. So I want to go back to the failures to follow up on brain damage and the example of the MRI. So let me ask you about, I think this came up earlier, the question of this two-edged sword. I think you make a fairly powerful argument as to why this might have made a difference in a juror's mind, but it could have a different impact on a jury to suggest that this is someone who has poor impulse control and, as a result, someone that needs to be sanctioned by the ultimate sanction that the law can provide. So what about that? Not at all, Your Honor, and this is exactly why fetal alcohol was so crucial in this case, because they already put on a defense of bipolar that talked about his impulsiveness. So the idea that he had trouble controlling his impulses was already before the jury, and there was also before the jury a future dangerousness expert that explained that Mr. Williams had done very well in prison and would continue to do so. But fetal alcohol syndrome explains whatever tension exists there because people with fetal alcohol syndrome, like children, function very well in structured environments, and that is why their deficits don't become pronounced until later on in life when they leave school, when they leave their homes. And so the jury already knew that he had trouble controlling his impulses. They had testimony from an expert saying that he was going to do well in prison and he already had done, and fetal alcohol would have brought those two things together and explained why, even though he had trouble controlling his impulses, the unique nature of his condition meant that he would do okay in prison. That's precisely why it was so prejudicial to miss fetal alcohol syndrome in this case. Now, I want to talk about brain damage, because this is one of the ways in which counsel failed so profoundly. In August 2004, at the end of August, counsel got a report from Dr. Evans, a neuropsychologist, that said, and these are the exact words, that there was some evidence that Chris had brain damage. But not all brain damage is created equal. As your honors well know, there's some brain damage, like a spike to the head that makes you into a sphineous cage, as somebody who is violent. And then there's some brain evidence that makes you like Mr. Williams, a child in an adult's body, a person who has an average level IQ but functions like someone who's mentally disabled. And so to stop there, to not follow up on what kind of brain damage it was, in light of the fact that they already knew as a risk factor from March 2004, the risk of 23 risk factors, that the mother drank, at that point not to follow up was a profound failure in the team. And what's more, four months later, January 2005, counsel suddenly woke up and realized that they didn't have an MRI and that they never got this guy, a neurologist. So finally they talked to a neurologist. And they didn't tell the neurologist, Dr. Greissmer, that the mother drank. And they didn't give him Dr. Evans' brain damage test, even though they had them. And nonetheless, Dr. Greissmer's report said, there are neurological abnormalities here, and he would benefit from a further neuropsychiatric assessment. And if I get more evidence, I could revise my analysis. They never got the neuropsychiatric assessment. They never followed up with that information. And they never even gave that report to their testifying experts. So Dr. Halleck, for example, a psychiatrist, certainly didn't have the FARC diagnosis, but he didn't even have this report about neurological abnormalities from a neurologist when he testified. And the evidence is uncontroverted because Dr. Greissmer put in an affidavit at the PCR proceeding that had he been told of the mother's drinking and had he been told of Dr. Evans' brain damage test, he would have told the team to investigate FAS. And the state never challenged that affidavit. They never called Dr. Greissmer. They never cross-examined him. So those failures, there's no explanation for those failures to follow up. The team, there's no explanation in the record. Let me ask you this. So as I understand, just Neema has summarized what appears to be fairly powerful evidence that was presented, and essentially the point was that the only thing missing from this was the acronym FAS, and that isn't enough in this case. What's your response to that? Your Honor, I see I'm running out of time. May I answer the question? Yes, you may answer. Your Honor, this goes back to the first point that I made about the profound difference of fetal alcohol syndrome. This isn't about a different acronym for the same information. This is profoundly different information going to the jury about what this diagnosis entails. And the science on that diagnosis was established in the 90s. The fact that it makes you effectively a child, that it gives you the adaptive function of a mentally disabled person, if the jury had been able to place that on top of the existing mitigation case, it is more than likely that at least one juror would have gone the other way, but they never got to hear that. And the case law in this circuit and the Supreme Court is clear that if there are serious red flags of a unique and powerful mitigator and counsel fails to follow up and investigate those flags, which they did repeatedly in this case, with no strategic decision, that is an unreasonable investigation and it's objectively unreasonable for the BCR Court to defer to it. And that's really the crux here because the standard for Strickland is high and it's met in the cases in this circuit that meet it are rare. I thought the Supreme Court said it's just the opposite. You just need to look at an objectively reasonable lawyer in the circumstances. You have to look at whether for any decision not to investigate for the particular challenge conduct, you have to look about whether or not that was a strategic decision and if that strategic decision was based on a complete investigation or not. Because the point here is they couldn't have made a decision about whether or not to present fetal alcohol syndrome or not, to weigh it against the rest of their mitigation case because they never followed up to see if he had it and what it meant. Despite repeated red flags and warning signs, they failed to follow up as a reasonable investigation would. And that is what makes this case so rare and different, is that like in Wiggins, like in Gray, you had these warning signs that would have caused a reasonable attorney to look further. And if they had looked further, it would have led them, not just to cumulative evidence, but to a unique and profoundly important mitigator. All right. Thank you, Ms. Cedar. Thank you, Your Honor. All right. Ms. Brown. Thank you, Your Honor. I'd like to go back a little bit to the diagnosis that you've heard so much about today, fetal alcohol syndrome. There's been a suggestion this is profoundly different. But I think we need to look at it, first of all, in this respect.  The world of the medical profession and diagnosis will never coexist precisely in the legal world. This is a legal issue. The investigation, the extent of the investigation, is a legal issue. It's a legal framework that we look at. We're not looking at a medical framework. For instance, although there's been a suggestion that fetal alcohol syndrome is profoundly different than anything that the jury heard in this case, fetal alcohol syndrome is not even listed as a condition in the DSM. DSM-5 would actually have it as a possible cause of damage. It is not an exemption from the death penalty. It is a possible cause for damage. What is very clear in this record is that counsel knew there was an indication based on recognized testing instruments, psychological testing instruments, that there was dysfunction, there was brain damage. Mr. Malden, trial counsel, testified they did not intend to call Dr. Evans and, in fact, did not call Dr. Evans. That's brain damage. That's on page 22 in the second volume of the Joint Appendix. What we have here is a mesh of theories. We have a mesh of theories to get to the diagnosis, and we have a mesh of theories in reviewing what counsel is supposed to do and if counsel met that obligation. Again, this is controlled by Richter. It is difficult to establish ineffective assistance of counsel when counsel's overall performance indicates active and capable advocacy, not diagnosis, advocacy. I think that courts have been distracted by fetal alcohol syndrome. And if it is the profoundly different condition that has been suggested to you today, it is inconsistent to argue in this same litigation that, oh, it's not really fetal alcohol that's important, it's a genetic background. That's profoundly different. What we see is this is advocacy. And what the record shows is that counsel, back in 2005, which is very important to remember contemporaneous standards at that time and what would be expected, what they would be expected to know at that time. They looked at this, they put together their comprehensive defense because what they were looking at was a criminal proceeding, a sentencing proceeding, and what is that issue? It's the character of the defendant and the circumstances of the crime. What's particularly powerful in the defense that was presented below is that it is not in conflict with what the jury hears. It explains without being in conflict. Most of the defense evidence went to this episode type of defense. It even flowed into the lower risk factor for inflicting violence within prison, the adaptability. It was begun in closing in the first phase with Mr. McDougall saying, we see a change, it is shown in the journal itself. The investigators noted the change in this man so that there's a change in two months. It's an aberration. It is not his makeup makes him more violent. This is a very capable, very capable defense. The investigation is sufficient, and I thank you very much. Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Albert Diaz